UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

NEHEMIAH D. RANDLE,

        Plaintiff,

        v.                    Case No. 25-CV-157

CHRISTOPHER STEVENS, *et al.*

        Defendants.

---

## DECISION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Nehemiah D. Randle, who is incarcerated and is representing himself, sues multiple corrections officers and supervisors of the Green Bay Correctional Institution ("GBCI") under 42 U.S.C. § 1983 for allegedly destroying his property without due process, in violation of the Fourteenth Amendment and for allegedly destroying his property as punishment, in violation of the Eighth Amendment. The defendants move for summary judgment on Randle's claims. (Docket # 28). For the reasons stated below, the defendants' motion for summary judgment is granted.

## FACTS

At all relevant times, Randle was incarcerated at GBCI. (Docket # 30, ¶ 1.) Daniel Cushing was employed at GBCI as a Supervising Correctional Officer; Adam Whiting and Thomas Larson were employed as Correctional Officers; Jay Howarth was employed as Administrative Captain; Michael Schultz was employed as a Supervising Officer 2; John Kind was employed as the Security Director; and Christopher Stevens was employed as Warden. (*Id.*, ¶¶ 2–8.)

On February 1, 2024, Randle and his cellmate "were found unresponsive in their cell." (*Id.*, ¶ 15.) Staff suspected a possible drug overdose and a medical emergency was called to administer Naloxone (Narcan), which is used to rapidly reverse an opioid overdose. (*Id.*, ¶¶ 15–16.) Randle was removed from his cell breathing but unresponsive, and he "appeared to have blood-tinged vomit on his face, clothing, and floor." (*Id.*, ¶¶ 17–18.) Randle required two doses of Narcan before he became responsive. (*Id.*, ¶ 18.) He and his cellmate were taken to the emergency room for treatment and once they recovered, they were sent back to GBCI. (*Id.*)

After the incident, Cushing interviewed Randle. (*Id.*, ¶ 19.) According to Cushing, Randle "refused to say what caused the overdose." (*Id.*, ¶ 20.) He also "refused to speak about the source of the narcotics." (*Id.*) Randle asserts that he told Cushing that he took K2 and that there were no more drugs in his cell. (Docket # 47, ¶ 20.) Randle's cellmate was interviewed and stated that Randle had provided him with the narcotics as a gift. (Docket # 30, ¶ 22.)

On February 22, 2024, Cushing ordered Whiting and Larson to enter Randle's cell wearing protective gear and to inventory and destroy all property. (*Id.*, ¶ 23.) The defendants assert that wearing protective gear and destroying all property was necessary to prevent dangerous secondary exposure to the narcotics in the cell. (*Id.*, ¶ 11.) Currently at GBCI, narcotics are introduced into the prison when prisoners receive small pieces of paper soaked with the drugs, "which makes the narcotics undetectable to the naked eye and requires a scanner to detect." (*Id.*, ¶ 9.) Because the drugs are on soaked paper, they can be transferred "anywhere among an inmate's property or another surface of the cell." (*Id.*, ¶ 10.) As such, GBCI officials have determined that it is unsafe for staff to test every piece of property for

2

drugs because of the high risk of secondary exposure. (*Id.*, ¶ 11.) Staff at GBCI have previously been "unknowingly exposed to intoxicants requiring the use of Narcan" when searching cells for drugs. (*Id.,* ¶ 12.) Recently, more than three staff members had to go to the emergency room for treatment from secondary exposure. (*Id.*)

Whiting and Larson entered the cell in full hazmat gear and inventoried the items, placed all property in hazmat bags, and properly disposed of it. (*Id.*, ¶¶ 24–26.) The defendants assert that even with hazmat gear, staff are still "at a great risk of exposure." (*Id.*, ¶ 25.) The cell was also cleaned with bleach and repainted and the state-owned mattresses, bedding, clothing, and shoes were destroyed. (*Id.*, ¶¶ 27–28.)

The defendants assert that Kind decided to dispose of Randle's property due to the health and safety risk, and Cushing implemented Kind's decision. (*Id.*, ¶¶ 23, 32.) The defendants state Randle was issued a property receipt showing what property was destroyed. (*Id.*, ¶ 37.) Randle states that he was never given the receipt; rather, it was placed in his file. (Docket # 47, ¶ 37.)

On February 23, 2024, Kind sent a memo to Randle explaining why his property was destroyed. (Docket # 30, ¶ 38.) While Howarth processed the memo and related documentation regarding the decision, the defendants state that he had no involvement in making or implementing the decision. (*Id.*, ¶ 39.) The defendants also state that Schultz had no involvement in making or implementing the decision to destroy Randle's property. (*Id.*) As for Warden Stevens, the defendants state he "knew of this incident and subsequent investigations but did not make, order, or carry out the decision to destroy Plaintiff Randle's property." (*Id.*, ¶ 40.) They further note that "[g]iven the circumstances and the investigation

3

that followed, Warden Stevens condoned Officer Kind's decision after the disposal occurred." (*Id.*)

Randle states that none of his property was tested for narcotics before disposal. (Docket # 47, ¶ 25.) He also notes that the property sat in his cell from February 1, 2024, until February 22, 2024. (Docket # 48, ¶ 2.) Randle was not told that his property was destroyed until after it happened. (*Id.*, ¶ 3.) Nor was he given an opportunity to challenge the decision to destroy his property. (*Id.*, ¶ 6.) He asserts that his property was destroyed not because of fear of secondary exposure but because he was issued a conduct report, suggesting that it was destroyed as punishment. (*Id.*, ¶ 4.)

Randle also states that both Warden Stevens and Kind sent him a memo about his property. (Docket # 47, ¶ 38.) Additionally, Randle states that Howarth and Schultz both reviewed the incident report and gave a summary report for the incident report. (*Id.*, ¶ 39.) Warden Stevens further stated in response to Randle's interrogatories that he had "verbal communication" with Kind about the decision to destroy Randle's property. (*Id.*, ¶ 40.)

**SUMMARY JUDGMENT STANDARD**

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

4

In evaluating a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Randle makes two claims against the defendants. First, he argues that the defendants violated his Fourteenth Amendment rights when they destroyed his property without due process. And second, he asserts that the defendants violated his Eighth Amendment rights when they destroyed his property as a punishment for possessing narcotics. I will address each claim in turn.

### 1. Fourteenth Amendment Due Process Claim

To demonstrate a claim "for a procedural due process violation of a property right, [a plaintiff] must establish: (1) a protected property interest; (2) a deprivation of that property interest by someone acting under the color of state law; and (3) a denial of due process." *Booker-El v. Superintendent, Indiana State Prison*, 668 F.3d 896, 900 (7th Cir. 2012). A

5

protected property interest is created where a plaintiff has a legitimate claim of entitlement to the property, and a legitimate claim of entitlement "is 'defined by existing rules or understandings that stem from an independent source such as state law.'" *Id.* (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)).

The defendants argue that Randle did not have a property interest in the property in his cell because he contaminated it by introducing narcotics into the environment, thus rendering the property either contraband or a safety risk. Randle asserts that the defendants merely assumed that his property was contaminated and destroyed it without testing it. Thus, a question of fact exists as to whether Randle had a legitimate property interest in his other property besides the papers containing the drugs, because a prisoner generally "has a protected property interest in personal possessions." *Jones v. Burton*, Case No. 05-C-527, 2005 WL 2373859, at *2 (W.D. Wis. Sept. 26, 2005) (citing *Nance v. Vieregge*, 147 F.3d 589, 590 (7th Cir. 1998); *Caldwell v. Miller*, 790 F.2d 589, 608 (7th Cir. 1986)).

This question of fact is not material, however, because even if Randle did have a property interest, he received adequate due process. There are two types of potential due process claims: "'claims based on established state procedures and claims based on random, unauthorized acts by state employees.'" *Leavell v. Ill. Dept. of Nat. Res.*, 600 F.3d 798, 804 (7th Cir. 2010) (quoting *Rivera-Powell v. New York City Cd. Of Elections*, 470 F.3d 458, 465 (2nd Cir. 2006) (citations omitted)). Here, the deprivation was a result of a random, unauthorized act by the defendants and not based on established state procedures. In other words, Kind's decision to destroy all of Randle's property due to potentially dangerous contamination was based on the facts and circumstances of the specific situation rather than pursuant to DOC policy or Wisconsin state law.

6

When a deprivation is a result of a random, unauthorized act, whether intentionally or negligently, "it is impractical to insist on a pre-deprivation hearing." *Simpson v. Brown County*, 860 F.3d 1001, 1007 (7th Cir. 2017). As such, "deprivations do not violate [the Due Process Clause] provided, of course, that adequate state post-deprivation remedies are available." *Hudson v. Palmer,* 468 U.S. 517, 533 (1984). The Seventh Circuit "has repeatedly held that Wisconsin's post-deprivation procedures are adequate. In other words, due process is satisfied because adequate post-deprivation procedures exist." *Lewis v. Cable*, Case No. 21-CV-474, 2021 WL 3473202, at * 2 (E.D. Wis. Aug 6, 2021) (citing *Kimmons v. Waupun Property Staff*, 1 Fed. App'x 496, 598 (7th Cir. 2001)). Randle can avail himself of these post-deprivation procedures, including the inmate-complaint system, certiorari review under state law, and state tort remedies. *See Hamlin v. Vaudenberg*, 95 F.3d 580, 585 (7th Cir. 1996); *see also* Wis. Stat. §§ 893.35; 893.51; 893.52. Thus, he has adequate due process available to him. As such, summary judgment is granted in favor of the defendants.

> 2. *Eighth Amendment Claim*

"[T]he Eighth Amendment prohibits punishments which, although not physically barbarous, involve the unnecessary and wonton infliction of pain, or are grossly disproportionate to the severity of the crime." *Rhodes v. Chapman,* 452 U.S. 337, 346 (1981) (internal quotations and citations omitted). These include punishments that are "totally without penological justification." *Id.* (internal quotations and citations omitted).

The defendants argue that they had to destroy Randle's property to ensure the health and safety of both the staff and the other prisoners because the risk of second-hand exposure to K2 was too great. Maintaining security, including the health and safety of prisoners and staff, is "perhaps the most legitimate of penological goals." *Overton v. Bazzetta*, 539 U.S. 126,

7

133 (2003). Disposing of Randle's property without testing it for narcotics does not demonstrate that the decision to dispose of the property was without penological justification. GBCI has experienced several issues in the past with second-hand exposure to opioids, resulting in at least three staff members having to seek emergency treatment. Randle has not demonstrated that the destruction of his property was purely for punitive purposes, and the defendants have shown a legitimate penological interest in the destruction of the property. As such, summary judgment is granted in the defendants' favor.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is granted. The defendants also argued that they are entitled to qualified immunity. Because the court found in the defendants' favor on the merits of Randle's claims, this argument need not be addressed. As there are no remaining claims, the case is dismissed.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that the defendants' motion for summary judgment (Docket # 28) is **GRANTED**.

**IT IS FURTHER ORDERED** that the case is **DISMISSED**. The Clerk of Court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

8

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin this 22nd day of July, 2026.

BY THE COURT:

NANCY JOSEPH
United States Magistrate Judge